We're going to go on to case number 2, 141780. Ziebell v. Fox Valley Workforce Development. That's okay. How wonderful that you want to get up here.  I did wonder, actually, because I knew that that young woman was not Mark Gustafson. Or anyway, I thought it. So, you are Mark Gustafson? Yes. Come on up. Okay. Good morning. Good morning, Your Honors. In the time I have allotted today, I want to talk about two of the main issues in the case. I represent Ms. Ziebell on behalf of the United States as well. The first issue I want to talk about is the public disclosure bar and whether or not Ms. Ziebell is an original source under the False Claims Act. Does the record suggest that she was an original source of any information other than with respect to Ms. Welsh's February 1, 2008 letter to the DWD? And I wondered how she would qualify as an original source with respect to that letter given that the letter was addressed to a public agency. The first question, I believe, is whether or not the DWD audit alleged fraud or at least the elements of fraud, and I don't believe it did. It talked about regulatory noncompliance issues and issues between the sub and the general contractor, but it didn't outright say what you're doing is deceptive or fraudulent. And once the reply that the CEO, Ms. Welsh, made to the DWD was the fraud or the deceptive half-truth that she told. The deceptive, I'm sorry. It was a half-truth. Half-truth, thank you. Exactly. It's a False Claims Act case based on a half-truth, which is very unusual. And Ms. Zabel, when she took the audit and the response to the board meeting and tried to bring it to light, I think she was an original source of that information, the fact that she had made a representation that she was essentially it appeared to be compliance when she never really intended to comply. You seem to have characterized Ms. Welsh's February 1st letter in two different ways. At times you've appeared to rely on it as an affirmative promise or certification that we would no longer be providing direct services. But on appeal, you appear to be saying that Ms. Welsh cleverly avoided making any such promise. If there was no unequivocal representation as to what actions the board and we would take, how can the letter support a claim under the False Claims Act? Because Ms. Welsh knew when she told the DWD that the subsidiary would not engage in competitive bidding, she knew that the DWD representative would assume then that it would not be providing services because bidding was a prerequisite to providing services. Ms. Welsh knew that in the background, the subsidiary and the general had a cooperation agreement that negated the need for the sub to bid. So that is the half-truth. She said we will comply with not engaging in competition, which created an impression in the DWD's mind that, okay, well, then no services will be rendered. Does that make sense? That's a half-truth. It's a truthful representation intended to deceive. Are you then characterizing it as it's a falsity by omission, in a sense? Yes, in a sense. It's also reinforced by the fact that she then offered $1,000 to each of the personnel of the sub to stay on beyond the voting date by the fact that she fired the CFO who took the letter and the audit to the meeting immediately after the meeting. And immediately after the firing, the board of the sub met to reincorporate for another year. So the subsequent facts show that an intent, or at least a jury, could find that to deceive. Now, if the report itself only raises the issue of regulatory noncompliance and not explicitly fraud, as you characterized it a moment ago, did Ms. Zebel bring any other facts or information to the table that then took those allegations to the next level of actually alleging fraud? What information did she contribute that makes it a claim for fraud? Well, she related to the federal government and to the state after she was terminated through a WIA complaint what Ms. Welch, the CEO, had done in response to the DWD audit. So she brought that to the federal government. When? Immediately after her termination in the summer of 2008. I thought she went to the DWD with that. She did, but the DWD, because of alleged program violations, did a reciprocal filing with the OIG of the Department of Labor. But she never went to the feds. She never went directly to the feds until after we filed the... What happened is that ultimately the DWD ordered a hearing before the executive committee of the board. And that never took place, so we were like, well, what do we do now? So we filed the false claims action, and then we interacted with the U.S. attorney in Milwaukee, and then also everything that we sent to him also went to OIG. Yeah, that's too late. I agree, except for the... And the complaint to DWD was an allegation that she was fired in a retaliatory way. It really wasn't a whistleblowing on false claims activity. Her WIA complaint incorporated the subsidiary issue. It's in the record, the complaint itself. What is your theory of false claims violation? I'm having a hard time with that. Okay, under the case... I don't want a case. I just want, tell me what claim was false that was filed with the federal government. In order to perpetuate the money flowing to the subsidiary, the CEO of the subsidiary deceived its direct regulator, or most direct, the DWD, and then saying that, in essence, that they would cease providing services and then turned right around and maintained the relationship. That's a false claim, and the money continued to flow out. Did they submit a reimbursement claim? Was there a necessary condition to payment? I mean, this is money in a federal-state cooperative program that flows through DWD to these local agencies. It is a convoluted bureaucracy where it comes out of the federal government. Right, and it's a troubled program. Well, I'm just saying it is very difficult, but the state has to make certifications to the federal government that its workforce development boards are in compliance with the law as a condition of payment. Right, but the local agency didn't make any false certifications. I mean, the cases that you cite are false certification cases, and that, it seems to me, I mean, you didn't explain any of this in your brief here. You didn't explain any of this in your brief in the district courts. I'm just surmising, but I am guessing that you're trying to fit yourself in under the false certification doctrine. And the local agencies don't make certifications to the feds, as I understand it. They are accountable to the state agency. Exactly. Initially, they make these certifications through the local plans, and they do certify that they're going to comply with the fiscal controls of it. Prospectively. You know, that's just a general, we will comply with all regulations. That's not enough to get you into the false certification, False Claims Act door. But to the extent there are certifications made, that's how they were made, to the state, and then the state made them to the feds. That's the best you can do. That is just how it happened. That's what happened. But on the public disclosure part, you didn't go to the federal government. Your client didn't go to the federal government before filing suit. She went to the state government first, and then they did a reciprocal filing of all the complaint substance to the OIG. And our proposed findings of facts attached to the proposed finding of fact is the letter from the Department of Workforce Development's Right. To get out of the public disclosure bar, she's got to be the original source. She's got to have independent knowledge. True. Not derivative knowledge from what's in the audit. And she's got to go to the federal government with it. I agree with you. And she certainly didn't go to the federal government with it. She went to the state government, which did a reciprocal filing. Okay? If you stop all your time, but I will give you a minute for your rebuttal. Okay. Thank you, Your Honor. Thank you. Okay, Mr. Wall. Good morning. Good morning, Your Honor. Good morning, Your Honors. May it please the Court. My name is Dustin Wall. I represent Fox Valley Workforce Development. And to the extent workforce economics is no longer in existence, but them as well. Your Honor has covered a lot of what I was going to go over. In my notes that I had here, my first question is, you know, this is a false claims act. It's a fraud act, and Ms. Eibel has not shown any fraud. There's no claims here that the board was trying to defraud the government. All we have is regulatory noncompliance. So there's no fraud that's been shown. If we gave her the benefit of the doubt, could a fact finder infer from the DWD's 2007 audit report that if the board failed to address the concern about its reliance only to provide services, that funding might be cut off in the future? And if that inference were reasonable, which may or may not be the case, might that support her claim in some way, do you think? No, I don't think. And we're guessing, we're inferring, we're wondering, because it hasn't been put forth in the briefs. But the case law in this circuit specifically is very clear that the DWD, with regard to a condition for payment, and there's nothing here like there is in Medicare when you submit a claim and you say, I understand that I might not get paid if I'm lying. There's nothing like that here. There's regulations. You know, when they set up the board, they said we're going to apply, you know, we plan to follow the law. And what happened here is the DWD and then the federal government, they learned about these issues, that there wasn't the arm's length distance between the two entities. They found out, look, you're not complying. You said you were. You know, it's not enough. And you saw, if you look in the record, there's letters that go back and forth. No, really, it's still not enough. No, really, you're closer, but keep on going. So the government here, we already see what they're going to do if they find out, you know, that this problem exists. And what they're not going to do is yank the funds. People aren't going to go in here to one of these programs and find that they can't get help finding a job. It's just, hey, we're going to work with you so that you can comply. There's nothing in here that says any certification was a condition of payment or that the government was going to close the purse strings if, you know, if the certification wasn't made or if that wasn't addressed. I think what would happen eventually is we're going to say, you know what, we're going to find another board. You know, we're going to go to the local elected officials and we're going to say set up a board that will work with us and comply. But there's nothing in the record that says what the government's going to do is going to, you know, stop funding, you know, and pull up the funds. And I think it's interesting that we have a, you know, we see what the government is going to do. We see that that's not what they're going to do. So as your honors pointed out, the next thing is this is the False Claims Act. There's been no evidence here what the claims are, what claim was made. There's been general discussion about that, but what claim has been made and what claim has been made to the United States government specifically for payment and how, one, what claim? I don't know what claims we're talking about because they haven't been identified. Two, why would any claim be false? There's got to be a false claim. And it's got, you know, three, it's got to be knowingly presenting a false claim. And I'm going under the part, you know, there's two parts to the statute. There's one knowingly presenting a false claim for payment and the other one is, you know, knowingly making a false statement or using a false record to get a false claim paid. Well, they both require a false claim. So we don't know what the false claims are, let alone that they were knowingly made. And then you get to the next layer of it, if you're going to go on a false certification theory, and there's just no showing that there's been a false representation made to get a false claim paid. The first two representations that were thrown out there were made before the board was even formed. And they were just general. They said we're going to comply with the law. There's no proof that when they made that, in order for it to be false, they have to know at the time that they're not going to do what they say. No proof of that. And then you have Ms. Welch's statement. And what happened there was, I mean, it was pointed out, here's the recommendations. You need to have more of an arm's length distance. Otherwise, it really looks like you're essentially providing direct services, which you're not supposed to do. And she said, you know, okay, you're right. What we're going to do, here's what we're going to do to address it. We're going to work on that. We'd like your help. We're going to put out the bids like we used to do, like you suggested, and bless you. And right now, and as you said right in there, right now, you know, they don't plan on bidding for it. And that's what she said they were going to do. She went. She implemented those. They put out the bids. And then there was the meeting the day before the board meeting, and they only had two bids. Only one of those entities could cover the whole seven counties. And there was concerns with them, with their ability to do that. And so they said, you know what, we don't want to have a big gap here in the services. So what we're going to have to do is we're going to let Workforce Economics keep on doing it for part of it, not even for the whole thing. So that's what they did. To say that there was some intent that she was gaming the system, she said, look, I'm going to tell them that we're going to try to comply, but we're really going to keep on doing business as usual, that's speculation. There's no evidence there. Why would she tell the managers, hey, guess what, guys, we can't provide direct services anymore. You're going to be out of a job at the end of June. And say, but please stay on. I'll pay you $1,000. Well, some of those people probably are going to leave, even with the $1,000. So to say that she's trying to defraud the government, there's just no evidence of that here. Skipping around here. Another thing that I just wanted to point out is it's very frustrating that we're arguing based on the district court did a lot of the work and kind of culling through the record and trying to make arguments for the plaintiff. Everything I've been up here doing is kind of based on that and doing the same thing. But I think this is an easy affirmance here because the summary judgment. Let me take easy cases. Is this a belated request for fees under Rule 38? Yes, Your Honor. I'm not exactly sure what that is, but I'll take it. So we're doing your work for you, too. Should we issue an order to show cause? Yes, I'll take one of those, too, Your Honor. For a frivolous appeal, for inadequate briefing. Yes, Your Honor. Yes. And what we had here, and I pointed it out in the brief, the district court said, look, this is a false claims act. What we would expect is evidence of false claims. There's no evidence of what the false claims are. We get the same thing again with this court. I think there's one case cited, and that was only in the appellate brief. No citations to the record. It feels like a gotcha, a technical gotcha, but it is. It's out there. It's palpable. It's obvious. It might not be easy, but it's what has to be. This could have been kicked on Rule 9 on the pleading stage because Rule 9 applies to false claims act cases. You have to plead fraud with particularity. That's not here. To this day, we don't know what theory Ms. Eibel is going under for the false claims act. So there's just nothing there. So I just wanted to reinforce that and ask for those things that you mentioned, as was my plan. If you knew what they were. If I knew what they were. With regard to the original source argument, you know, this all stemmed from the DWD's investigation. And they were actually, the board was complying with the rules for several years. It was instituted in 2000. WE wasn't formed until 2004. So they were going along fine for four years. In 2004, they formed Workforce Economics and have this agreement. And it's kind of funny, right in there they say, we realize we're not allowed to provide direct services, so we're going to create a board to do that. Things will be easier and it will work out well. I guess that didn't fly. That was found out for the first time by the DWD in 2007. And then everything else stems from there. Ms. Eibel admits in her deposition, that's what got the ball rolling here. And then, you know, there was working with it to get compliance. So for the public disclosure bar, it just has to arise out of the same facts and circumstances. And, of course, it's not fraudulent there, you know, in the investigation. They didn't find fraud because there's no fraud here. And all that we have here is, I think I got into that, you know, just the letter with recommendations. Ms. Eibel responded as to what her plan was, Ms. Welch, sorry. And all that Ms. Eibel has to add, if anything, is saying, hey, look, you're still not in compliance. But the DWD knew that. This isn't going to go away. This isn't something that they were going to be able to keep hidden, the fact that WE was still providing services. It was a work in progress. So there's really nothing that she brought to the table here because the spotlight was already on them. It was an open investigation. Thank you, Your Honor. Thank you. I still question why, if everything was legitimate, why did they fire their CFO for bringing these documents to the meeting? And they expressly put in writing that that's why they did it. I think it was they fired her for creating a disturbance at the meeting. And the disturbance was bringing the documents and sharing them with her co-worker. She didn't ever present the documents or ask to be recognized in order to present the documents. She was just creating a disturbance in the hope that somebody would notice her, is I think what her testimony was. That is true. She was afraid, and she was rightfully afraid because she got fired for doing it. Isn't the fact that she didn't actually formally complain to anyone until after she was fired undermine her retaliation argument, her retaliatory discharge argument because she hadn't, at the time that she was fired, done anything that would be construed as taking steps towards bringing a False Claims Act claim or otherwise really alerting any government entity about what she considered to be fraud? They did fire her very quickly. And if she had maintained her employment, she may very well have done that. But they fired her immediately after bringing those documents to the board meeting. She didn't have any time during her employment. When she learned that this would be perpetuated and brought them to the board meeting, this was on a Thursday, the following Monday morning she was terminated. There was no, she didn't have any time to do anything. Is it your argument that at the time she was discharged, her employer was concerned that she was going to be filing a False Claims Act case? I believe that, again, Ms. Zabel only learned that they were going to put the vote to perpetuate the subarrangement up for a vote the day before the vote. And then she immediately did take action. She did what she could anyway, what she was able to do in light of her fear. And then they terminated her. I can't tell what would happen had they not terminated her. Okay. Thank you very much. Okay. Thank you, Your Honor. The case will be taken under advice.